420 A.2d 733

**ERIE INSURANCE EXCHANGE, Appellant,**

v.

**William C. ROULE.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1979.

Filed June 27, 1980.

Stephen P. McCloskey, Washington, for appellant.

C. Jerome Moschetta, Washington, for appellee.

Before PRICE, HESTER and CAVANAUGH, JJ.

HESTER, Judge:

Presently before the court is the appeal of appellant, Erie Insurance Exchange (sometimes Erie) from the order of the lower court dated March 6, 1979, sustaining appellee's preliminary objection in the nature of a demurrer and dismissing appellant's complaint.

We affirm.

The facts may briefly be summarized as follows:

Erie was appellee's No–Fault provider pursuant to the Pennsylvania No–Fault Motor Vehicle Insurance Act (sometimes the Act), 40 P.S. 1009.101, etc., on October 21, 1977, at which time appellee was injured in a motor vehicle accident. As a result of said accident, appellee, a member of the United Mine Workers of America, sustained personal injuries and was unable to engage in his employment as a coal miner. From October 29, 1977 through February 15, 1978, appellee was paid No–Fault work loss benefits pursuant to the Personal Injury Protection (PIP) provisions of the No–Fault policy of insurance. However, from December 8, 1977 until March 27, 1978, appellee's union, the United Mine Workers of America, was engaged in a strike with the coal operators.

Appellant thus filed its complaint in assumpsit alleging that due to the strike, work would not have been available

for appellee and, as a result, appellant is entitled to reimbursement of the wage loss benefits paid to appellee from December 8, 1977 (the strike date), through February 15, 1978 (the date when appellant terminated appellee's wage loss payments). Basically, appellant is seeking reimbursement of the alleged overpayments made by it on the theory that appellee was not rightfully entitled to work loss benefits during that period of time (December 8, 1977 through February 15, 1978). Appellant argues that appellee sustained no compensable work loss during that period of time. Appellant contends that under the applicable provisions of the Act, an individual who may otherwise be eligible for wage loss benefits and who is a member of a labor union which engages in a strike subsequent to the individual's injury, is not entitled to recover work loss benefits during the time his labor union is engaged in said strike. Succinctly stated, appellant contends that appellee is not entitled to wage loss benefits during the period of the work stoppage, notwithstanding appellee's otherwise entitlement, because appellee would not have been earning wages during said strike.

We do not agree.

The issue raised in the instant case is one of first impression in the Commonwealth under the new Pennsylvania No–Fault Act.

Accordingly, because the Act does not address itself directly to the issue presently before us, we must review and analyze the findings and purposes of the Legislature in promulgating the Act as well as the definitions contained therein:

Section 102 of the Act entitled *Findings and Purposes* provides, *inter alia* :

That Pa. should have . . . a basic system of motor vehicle accident and insurance law which:

(A) assures every victim . . . recovery of a reasonable amount of work loss, . . .

(b) Purposes.–Therefore, it is hereby declared to be the policy of the General Assembly to establish a reasonable cost to the purchaser of insurance, a Statewide system of prompt and adequate *basic loss benefits* for motor vehicle accident victims and the survivors of deceased victims. (Emphasis added).

Section 103 captioned *Definitions*, provides in relevant parts:

§ 103.  Definitions.

"Basic loss benefits" means benefits provided in accordance with this act for the net loss sustained by a victim, subject to any applicable limitations, exclusions, deductibles, waiting periods, disqualifications, or other terms and conditions provided or authorized in accordance with this act . . .

"Loss" means accrued economic detriment resulting from injury arising out of the maintenance or use of a motor vehicle consisting of, and limited to, allowable expense, work loss, replacement services loss, and survivor's loss.

"*Loss of income*" means gross income actually lost by a victim or that would have been lost but for any income continuation plan, reduced by:

(A) eighty per cent (80%) of any income which such individual earns from substitute work;

(B) income which such individual would have earned in available substitute work he was capable of performing but unreasonably failed to undertake.  (Emphasis added)

"Net loss" means loss less benefits or advantages required to be subtracted from loss in calculating net loss pursuant to this act.

"Work loss" means:

(A) loss of gross income of a victim, as calculated pursuant to the provisions of section 205 of this act; and

(B) reasonable expenses of a victim for hiring a substitute to perform self–employment services, thereby

mitigating loss of income, or for hiring special help, thereby enabling a victim to work and mitigate loss of income.

Accordingly the concept of "basic loss benefit" as used in the No–Fault Act must be considered in light of the juxtapositioned terms "loss", "work loss", and "net loss".

As quoted above: "basic loss benefit" is defined as: "the *net loss* sustained by a victim, subject to any applicable limitations, exclusions, deductibles, waiting periods, disqualifications, or any other terms or conditions provided or authorized in accordance with this act."

Did Appellee in fact suffer a net loss of wages from December 8, 1977 to February 15, 1978? Section 103 defines the terms "work loss", "loss of income", "loss", and "net loss", all of which are relevant to the calculation of one's entitlement to work loss benefits. Both terms, "work loss" and "loss of income" require a showing of "accrued economic detriment". Following the finding of an "accrued economic detriment", one's work loss then must be further reduced to ascertain one's "net loss". To ascertain "net loss", "loss" must be reduced by those deductions, benefits, or advantages as defined in Section 206(a) (which are not applicable to our present inquiry).

The "loss of income" definition, as defined in Section 103 and calculated in Section 205 of the Act, requires the subtraction from the gross income loss of a victim of eighty percent (80%) of any income realized by the victim from substitute work. Moreover, nowhere does the Act address itself to a situation where a subsequent work stoppage is caused by a force or forces outside the control of the victim.

However, the Act specifically addresses itself to the issue of "substitute work". The applicable provision of appellee's PIP endorsement, which is in accord with Section 103 of the Act, defines the term "loss of income" as the "gross income actually lost by an eligible person . . . reduced by:

(a) * * *

(b) income he would have earned in *available substitute
work he was capable of doing* but unreasonably failed
to undertake. . . . (Emphasis added).

The above demonstrates that in determining whether a
victim has sustained a loss of income, the Legislature intend-
ed that the availability of *other* employment be considered,
rather than merely the availability of a victim's *particular*
job which he was performing at the time of an accident. In
the instant case, appellee rightfully posits that the severity
of the personal injuries was the reason for appellee's entitle-
ment to wage loss benefits from December 8, 1977 through
February 15, 1978. It logically follows that, *but for* the
personal injuries sustained, appellee *would have been availa-
ble* for substitute work during the period of the coal strike.

Appellee is therefore entitled to work loss benefits be-
cause of his removal from the labor market as a result of the
personal injuries sustained. The injuries sustained, and not
the labor strike, removed appellee from the labor market
and, therefore, was the direct and proximate cause of both
income and work loss. Sections 103 and 205(a), when read
together, lead us to conclude that when a regularly em-
ployed individual such as the appellee in the instant case,
sustains "loss of income" during the time period that he is
either incapable of performing his regular job or is incapable
of performing other available substitute work.

For the reason that the issue before us is one of first
impression in the Commonwealth under the No–Fault Act,
we look for guidance to other Pennsylvania appellate deci-
sions which may be analogous with the situation at bar. In
*Michael v. Roadway Express, Inc.*, 211 Pa.Super. 238, 235
A.2d 627 (1967), our court in the context of determining
whether a claimant was entitled to compensation under the
Pennsylvania Workmen's Compensation Act concluded that
such factors as voluntary strike activity and/or industrial
layoffs are not relevant or appropriate in resolving whether
a claimant has sustained a loss of earning power based upon
an employment related disability. As the court concluded:
"Nowhere in these determinations is it appropriate to deny

disability benefits because loss of income is due to 'voluntary strike activity and/or industrial layoffs.'" 211 Pa.Super. at 242, 235 A.2d at page 629.

Our Commonwealth Court in *McKinney Manufacturing Corp. v. Workmen's Compensation Appeal Board,* 9 Pa. Cmwlth. 79, 305 A.2d 59 (1973), also in a Workmen's Compensation Act context, similarly concluded that the Workmen's Compensation Act does not indicate that voluntary strike activity may be considered either as an appropriate or relevant factor in a fact–finder's determination of claimant's loss of earning power.

Therefore, we conclude that since appellee under the Pennsylvania No–Fault Act was *physically incapable* of performing either his regular or other available substitute work during the period in question, the happenstance of a labor strike is of no consequence. Appellee was rightfully entitled to receive work loss benefits for the time period at issue. The lower court properly so ruled when it sustained appellee's preliminary objection in the nature of a demurrer to appellant's complaint and, therefore, dismissed appellant's complaint.

Order affirmed.